51 CCPA
**Application of Lemuel D. WOODDY, Jr., and William D. Moore.**
**Patent Appeal No. 7203.**

United States Court of Customs and Patent Appeals.
May 14, 1964.

The invention relates to a method for creating a large cavern within a subterranean salt formation. The cavern may subsequently be used for storing liquid products such as petroleum. Prior to appellants' invention, cavities had been formed in the salt formations (called "domes") by water elution techniques wherein water is injected through a tube into the salt dome, then pumped out when saturated with salt. However, for large cavities, the specification points out that "extremely long elution times are required," and at the end of the elution period, the cavity is filled with brine. For some purposes, a dry cavern is required, in which case "the cost of pumping water from the subterranean cavern becomes quite high and moreover, the dewatering time is excessively long."

In appellants' process, water is injected according to the usual practice to make a small cavity sufficiently large to hold a nuclear device. The small cavity is dewatered, the well is sealed, and the nuclear device is detonated.

Appellants allege that the nuclear device melts a large body of salt which may be removed through a second well by introducing a fluent volatilizable material, such as water, or natural gas.

Representative claim 4 reads:

"A method which comprises the steps of drilling a well from the surface of the earth into a compact subterranean salt formation, eluting a cavern with water below said well in said salt formation, whereby at the end of the elution step a water-filled cavern is provided, dewatering said cavern, inserting a nuclear device into said cavern through said well, sealing said well with a solid material, detonating said nuclear device whereby a zone of hot salt at a temperature above the melting point of salt is formed, drilling a second well into said thus-formed hot zone, concentrically arranging a casing and a pipe within said well, heating said casing and said pipe, arranging

Frank S. Troidl, Houston, Tex., for appellants.

Clarence W. Moore, Washington, D. C. (Joseph Schimmel, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals which held appellants' claims unpatentable because of a defective disclosure in the patent application.[1] The board found the disclosure both insufficient under 35 U.S.C. § 112 and apparently inoperative.

---

1. Serial No. 747,279 filed July 8, 1958 for "Method of Creating Cavities Within Salt Domes."

638

a tubing in said pipe extending from the surface of the earth to a point adjacent the bottom of said hot zone, introducing a fluent volatilizable material into said hot zone through the annulus between said casing and said pipe in an amount sufficient to generate a pressure within said hot zone sufficient to force hot salt through said tubing to the surface, whereby a desired amount of said heated salt may be removed from said zone."

The examiner was not convinced that the claimed process would operate in the manner recited or that the specification sufficiently describes the invention. He said:

"* * * first, that applicants' disclosure does not adequately teach one how to carry out the explosion step. Secondly, there is insufficient basis for concluding, (a) that a large body of molten salt will form, (b) that this large body of molten salt will remain molten until it is to be removed by injecting fluid into the hot zone and (c) that the salt will be in a fluid state capable of being flowed up the outlet tube by gas pressure."

At the time of the Examiner's Answer, the only underground explosion of a nuclear device (in 1957) resulted in the roof over the explosion falling in and forming rubble. The examiner took the position that the application failed to indicate how a similar result would be prevented when appellants' underground nuclear device was detonated. Subsequently, in 1961, another underground nuclear detonation experiment was carried out, called Project Gnome. Appellants called the examiner's attention to the results of the experiment, pointing out (1) that a cavity was formed without the roof falling in, and (2) that "Holes can be drilled to penetrate into the cavity after the nuclear explosion."

The Board of Appeals considered the results of the Project Gnome test, but said: "If anything this material seems to confirm the Examiner in his position

* * * ." The board apparently was impressed with a publication of the Lawrence Radiation Laboratory of the University of California for the Atomic Energy Commission concerning the "Proceedings of the Second Plowshare Symposium" (referred to below as UCRL–5677). This publication states that the amount of molten salt in the Project Gnome test was expected to be "3% of the volume of the 220-ft-diameter cavity."

The board also noted that appellants have given no data whatever with respect to "the temperature to which fluent volatilizable material is heated and the amounts thereof introduced into the cavity, together with the pressures of introduction thereof in order to force the molten salt out before it solidifies * *." The board found no disclosure of provisions "for the dissipation of the radioactivity of the molten salt" produced by the method.

On reconsideration, the board discussed at greater length its views on the Project Gnome test results. The board said:

"Appellants admit on page 11 of their petition for reconsideration that in the Gnome operation 'the molten salt did become vitreous and hence congeal.' This certainly indicates that some steps, here undisclosed, must be taken to keep the salt molten and thus susceptible to being removed from the cavity. We have restudied the documents previously submitted by appellants, as well as the document accompanying the petition for reconsideration, but have been unable to find any indication therein that molten salt was encountered 10 to 100 days after detonation or that the temperature after that interval was in excess of approximately 800° C. (1472° F.), the melting point of salt. Page 213 of the 'Plowshare Program' paper previously filed by appellants refers to re-entry into the shot region on December 22, twelve days after detona-

tion, but there is no mention of molten salt or of temperatures in excess of 800° C."

We note that the board appears to consider both of the grounds of rejection together in the above quoted paragraph. That is, the disclosure does not point out what must be done to maintain the salt in molten condition until it is removed, and there is nothing to indicate that the process as claimed is operative. Since the two grounds of rejection are to a large extent interconnected, we find the board's approach logical.

Appellants contend that the invention is not a new or improved nuclear device, so a detailed description of the device is unnecessary. Those skilled in the art know how to make, construct and operate nuclear devices, appellants point out, because of long prior experience in the art. In addition, appellants state that details of the nuclear device may not be presented in the application "because these details are barred from presentation under the Atomic Energy Program."

As to inoperativeness, appellants argue that:

> The Patent Office has failed to show that Appellants' disclosure is clearly inoperative. The burden is upon the Patent Office to show beyond doubt that the disclosure is inoperative. The Patent Office has not done this.

The Gnome Project failed to keep the salt molten, according to appellants, because a shaft and tunnel were dug into the salt bed which permitted heat to escape. Their brief states:

> "Thus, the shaft and tunnel constitute very large holes. The drill hole of Appellants' method, however, very rarely exceeds nine inches in diameter, a small hole."

Since the purpose of Project Gnome was not to remove molten salt, appellants conclude that absence of a shaft and tunnel would result in heat retention to maintain the salt in molten condition.

It appears that no one on earth is certain as of the present whether the process claimed will operate in the manner claimed. Yet absolute certainty is not required by the law. The mere fact that something has not previously been done clearly is not, in itself, a sufficient basis for rejecting all applications purporting to disclose how to do it. In re Chilowsky, 229 F.2d 457, 43 CCPA 775. Our statute requires, inter alia, that the invention be useful (35 U.S.C. § 101) and that it be fully disclosed (35 U.S.C. § 112). If the process is inoperative, it is not useful. If the whole invention is not communicated to those skilled in the art on reading the disclosure, the inventor is not entitled to his limited monopoly under the patent.

We are not convinced that appellants' invention *cannot* operate in the manner claimed, but we agree with the board that the disclosure does not set forth sufficient detail to provide reasonable assurance that the claimed process may be carried out by any person skilled in the art.

The examiner speculated, on the basis of knowledge available to him, that the claimed process would not operate in the manner claimed while appellants confidently predicted that carrying out the specific embodiment disclosed would result in "a cavern having a diameter of about 200 feet." The events described in the record which have occurred since the filing date have proved the examiner's speculation that the roof would cave in to be incorrect, but these events have failed to bear out appellants' predictions that the salt would remain molten for a sufficient period of time to permit pumping out the salt with hot gas.

Implicit in appellants' argument is the admission that the claimed method has never been performed. We do not hold that actual performance is a minimum requirement. However, when dealing with a subject like nuclear explosions, more than mere speculation as to the operation is needed. The invention should be reproducible by one skilled in the art when aided by the specification. It appears that no one yet knows how long the salt remains molten. Although

the specification states that it is "preferable to wait for a period of time within the range of about 10 to 100 days sufficient to permit a substantially complete decay of short-lived radioactive entities," there is no indication of the amount of salt that is still molten after the waiting period. While a small amount of salt may remain molten until the new well is drilled, if the invention is to operate substantially as disclosed, "about 20,000 to 35,000 cubic feet of cavern space per kiloton of nuclear energy release" should be obtained. If only a small amount of cavern space results, liquids cannot be stored and the invention is not operative in the disclosed manner.

The evidence before us does not prove that the invention is or is not operative. It does prove that what has been done to date does *not* produce large amounts of salt that stay molten indefinitely. While Project Gnome proved that the roof would not necessarily cave in to permit heat escape with resultant congealing of salt, the salt nevertheless solidified within the short period before examination of the cavity. Perhaps, as appellants suggest, the salt would not have solidified if the shaft and tunnel had not been present, but there is no evidence to prove that it would not. Appellants indicate that their drill holes are much smaller than the opening in Project Gnome, but there is no disclosure of any limitations in size of opening. The only proof from Project Gnome is that it *did* congeal with the opening present. What steps must be taken to insure success with a sealed hole are not readily apparent.

It is perhaps unfortunate that appellants have chosen a field of endeavor subject to extensive delays due to international test ban agreements, and subject to secrecy orders if too detailed in content. But these are not sufficient reasons for waiving the statutory requirements of full disclosure and usefulness to operate in the intended manner.

Here more is required of one skilled in the art than "only simple, well known laboratory techniques" as were required in In re Storrs, 245 F.2d 474, 44 CCPA

981, cited by appellants. It is not even clear that all of the potential problems have been uncovered inasmuch as the method has never been carried out.

Since the amount of molten salt, if any, remaining after decay of the short-lived radioactive isotopes is unknown, and the precise manner of and conditions for removing the molten salt are not specifically set forth, we will *sustain* the rejection made below.

Affirmed.