52 CCPA

Application of Hampton G. CORNEIL and Andrew D. Suttle, Jr.

Application of Hampton G. CORNEIL, Andrew D. Suttle, Jr., and Winfred O. Milligan.

Patent Appeal Nos. 7365, 7366.

United States Court of Customs and Patent Appeals.

June 17, 1965.

Rehearing Denied Oct. 12, 1965.

Smith and Rich, JJ., dissented in part.

Frank S. Troidl, Houston, Tex., for appellants.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

These are two appeals from decisions of the Board of Appeals which affirmed the examiner's rejection of all claims in each of appellants' patent applications[1] directed to methods of exploding a nuclear device in a subsurface cavern. While separate records and briefs were filed in each appeal, they were consolidated for argument here by counsel and we shall dispose of both appeals in a single opinion.

The subject matter of the present appeals bears close relation to the subject matter of Appeal Nos. 7284, 347 F.2d 557 and 7295, 347 F.2d 563, decided concurrently herewith. The applications in those appeals relate to detonation of a nuclear device in a subterranean salt cavern to produce radioactive isotopes and steam to be used for surface power. It is disclosed in the applications at bar that a "serious problem is encountered" in underground nuclear explosions of the above nature in salt formations. When a nuclear device is detonated in a gaseous or liquid medium, destructive forces tend to be generated due to transmission of high energy shock waves from the situs of the explosion. The shock wave may strike the walls of the cavern, causing cave-ins, spalling or other damage to the walls. It is the purpose of each application to provide means for attenuating

[1.] Involved in Appeal No. 7365 is application Serial No. 859,024 of Corneil and Suttle, filed December 11, 1959, for a "Method for Minimizing Shock Wage Effect."

Involved in Appeal No. 7366 is application Serial No. 859,023 of Corneil, Suttle and Milligan, filed December 11, 1959, having the same title.

the shock wave and prevent damage to the cavern walls.

Appellants in Appeal No. 7365 propose to protect the walls by providing in the space between the situs of the detonation and the wall surface "a stable foam having a density of not more than about 0.1 gm $cm^{-3}$." They state:

> * * * A foam may be considered to be stable for the purposes of the present invention when it will maintain its foam structure for a period of at least about one hour. Preferably, the foam should retain its structure for at least about ten hours. Many foams of this nature are commercially available and are well known to those skilled in the art. For example, a conventional so-called fire fighting foam prepared by the interaction of a strong mineral acid, such as sulfuric acid, with an aqueous solution containing sodium bicarbonate and a foam-stabilizing material, such as sodium aluminium sulfate, will provide a foam having a specific density of about 0.1 to about 0.01 gm $cm^{-3}$ and a foam life which may be substantially infinite inasmuch as the foam will dry to a solid. Moreover, the cell structure of such a foam will be exceedingly fine. Thus, individual cell diameters of a diameter of about 1 mm or less may be provided. * * * a fine cell structure is of particular advantage with respect to the process of the present invention. * * *

The foam is said to provide a multitude of cell walls which will be collapsed by the shock wave, thereby causing attenuation of the shock wave. Claims 2 and 4 are representative:

> 2. In a method wherein a nuclear device is detonated in a subsurface formation, the improved method for protecting the surface of said subsurface cavern from shock damage which comprises filling at least a portion of said cavern with a stable foam, introducing said nuclear device into said cavern, locating said nuclear device within said foam-filled portion of said cavern and thereafter detonating said nuclear device whereby the shock wave formed by detonation will be partially attenuated before striking the wall of said cavern.

> 4. A method which comprises the steps of eluting in a subsurface geological salt dome formation an ellipsoidal cavern having a major substantially radial axis with a length of about 2 to 10 times greater than the length of the minor axis, said minor axis having a length within the range of about 10 to 100 meters, substantially completely filling a void space within said cavern with a stable foam, spotting a nuclear device in said cavern, firing said nuclear device whereby a substantial portion of the kinetic energy released by firing of said device will be retained within said cavern as thermal energy and thereafter recovering at least a portion of thermal energy.

Appellants in Appeal No. 7366 disclose a technique said to offer advantages over the stable foam used in attenuating shock waves in Appeal No. 7365, particularly when high temperatures obtain in the cavern. They propose to explode a nuclear device in a subterranean cavern

> * * * at least partially filled with an exfoliated mineral having a bulk density of not more than about 0.25. Preferably, the material will have a weight in the range of 0.01 to 0.1 gm $cm^{-3}$. Representative examples of exfoliated minerals [2] include exfoliated vermiculites, micas and perlites (hydrated alumino-silicates). * * *

> * * * * * *

When an exfoliated mineral is provided in the space intermediate the

---

2. The Condensed Chemical Dictionary, 6th Edition (1961) states, under "Vermi- culite," that the "expanded" form of the mineral is also known as "exfoliated."

situs of a detonation and the surface to be protected, the shock wave that is produced by the detonation in passing through the exfoliated mineral will destroy at least a portion thereof. However, the destruction of each cell wall of each particle will result in the reflection of a microscopic amount of the total energy of the shock wave. In addition, melting of the components of the exfoliated particle will abstract a microscopic amount of the kinetic energy from the shock wave. As a consequence, in passing through an enormous number of particles, a substantial attenuation of the shock wave will occur. * * *

Claims 2 and 6 are representative:

2. In a method wherein a nuclear device is detonated in a subsurface formation, the improved method for protecting the surface of said subsurface cavern from shock damage which comprises filling at least a portion of said cavern with an exfoliated mineral, introducing said nuclear device into said cavern, locating said nuclear device within said thus filled portion of said cavern and thereafter detonating said nuclear device whereby the shock wave formed by detonation will be at least partially attenuated before striking the wall of said cavern.

6. A method which comprises the steps of eluting in a subsurface geological salt dome formation an ellipsoidal cavern having a major substantially radial axis with a length of about 2 to 10 times greater than the length of the minor axis, said minor axis having a length within the range of about 10 to 100 meters, substantially completely filling a void space within said cavern with an exfoliated mineral, spotting a nuclear device in said cavern, firing said nuclear device whereby a substantial portion of the kinetic

energy released by firing of said device will be retained within said cavern as thermal energy and thereafter recovering at least a portion of said thermal energy.

It is apparent that both applications at bar contemplate operation in a manner generally similar to that disclosed in the applications involved in Appeal Nos. 7284 and 7295, including recovery of radioactive isotopes or steam for use in surface power plants.

The examiner rejected all four claims in each of Appeal Nos. 7365 and 7366 as based on a disclosure which fails to comply with the requirements of 35 U.S.C. § 112. Claims 1 through 3 of each application were also rejected as unpatentable over the following reference:

UCRL [3] 5253, Industrial Uses of Nuclear Explosives, Sept. 9, 1958, pp. 10–19

That reference recognizes the difficulty of containing a nuclear explosion in underground caverns, particularly in resisting shock wave pressures. The vulnerable portion of the cavern is regarded as the roof, which can fall down and cause the cavity to "rise" until it breaks through the surface. In discussing ways of solving the problem, the reference states there "might be" a possibility of filling the cavity with some material that would absorb the shock before the walls are struck by the explosion. Among the materials suggested are air, water, a mixture of air and water or froth, snow, tin cans, and broken bottles. In small scale tests [4] of the efficacy of froth in containment of non-nuclear explosions, it is concluded that "the introduction of froth causes a qualitative improvement in the containment." The reference also notes that the problem of containment increases in difficulty with the yield of the explosion, and that the extrapolation of the small scale test results with froth to nuclear devices is a "complicated affair" deserving of theoretical study together with carefully controlled experiments.

---

3. University of California Radiation Laboratory.

4. A "gram or so" of tetryl was exploded in a one gallon can filled with "froth."

The board advanced substantially identical reasons for sustaining the rejection of claims 1–3 in each appeal over UCRL 5253, saying:

* * * We agree with the Examiner's rejection since in our opinion the suggestion in UCRL 5253 to employ a material which would absorb the shock of the explosion would suggest trying a wide variety of materials in addition to the tin cans, broken bottles, snow, air, water, and froth therein suggested. * * *

It found no evidence in the record in either appeal that appellants' choice of a stable foam or an exfoliated mineral produces a result different from that obtained when the specifically listed materials, particularly the froth of the reference, are similarly employed.

Appellants note that the examiner stated that the materials disclosed in UCRL 5253 are "equivalent, so far as evident," to the stable foam and the exfoliated minerals. They refer to that statement, along with the board's reference to the absence of evidence that stable foam or exfoliated minerals produce a result different from the UCRL materials, as application of a requirement that a new result be obtained for an invention to be patentable.

 However, we think it plain that the board regarded the disclosure of materials such as froth[5] to suggest the choice of stable foam or porous, exfoliated minerals as alternative sources of discontinuities to degrade the shock wave. Indeed, we note the reference speaks of water, made porous via air bubbles, as suitable in small scale tests. It seems to us that disclosure would render it obvious to one of ordinary skill in the art to use a more stable medium of the same general type, a stable foam or an expanded solid, for underground nuclear explosions where a longer time would necessarily be required between insertion of the shock attenuating medium and detonation of the device. We find no reversible error in the board's conclusion that the subject matter of claims 1–3 of each application are obvious in view of UCRL 5253.

In connection with the rejection of all claims in each application on insufficient disclosure, the examiner stated:

The process is speculative. Applicants state that the steam will flow through the outlet well * * *. This is speculation that the cavity will not collapse after the detonation, and that the well * * * will not be so damaged as to prevent steam outflow therefrom.

* * * U.C.R.L. 5253 * * * contains statements by those skilled in this field which casts serious doubt as to whether the cavity roof will not collapse. It also is believed reasonable to expect the well * * to be damaged to the extent [of] preventing flow of steam therethrough, and that there would also form openings or fissures resulting in the escape of steam * * *.

The board agreed with the examiner's position, and stated that appellants' specifications are

* * * apparently not complete and operative in such manner as to enable the skilled atomic technician to carry out the claimed method merely by following the directions and parameters individually disclosed in the specification. * * *

Appellants' processes wherein a nuclear device is detonated in a salt formation to form recoverable thermal energy or radioactive isotopes compare to processes disclosed in Appeal Nos. 7295 and 7284. UCRL 5253, not of record in those appeals, discusses the problems of leakage of steam through fissures in the rock and cave-in of the walls and roof. It also recognizes that any extrapolation of the qualitative improvement in containment achieved with froth in small scale tests to nuclear explosions is a "complicated affair" deserving of further theoretical study together with carefully controlled experiments. We regard that as further

---

5. We find many dictionaries define "froth" as "foam."

evidence of the speculative nature of the subject matter claimed herein.

 The disclosures of the applications at bar are substantially commensurate with those involved in Appeal Nos. 7295 and 7284, and we find no reason to depart from the conclusions reached there. We observe nothing in the present records from which we can conclude that one of ordinary skill in the art would be enabled to carry out the theory embraced in the claimed processes following the teachings of the respective specifications without extensive experimentation.

Appellants have urged that all of the appeals be decided in accordance with the following statement in In re Chilowsky, 229 F.2d 457, 43 CCPA 775,

> In our opinion the same principles should apply in determining operativeness and sufficiency of disclosure in applications relating to nuclear fission as in other cases. There appears to be no basis in the statutes or decisions for requiring any more conclusive evidence of operativeness in one type of case than another.

It seems to us the Patent Office has not deviated from that admonition. Quite the contrary, it has been followed, along with the interpretation of section 112 in In re Lorenz and Wegler, 305 F.2d 875, 49 CCPA 1227, where this court stated that applicants

> * * * must make a full and complete disclosure of their invention, *leaving nothing to speculation or doubt.* That Congress so intended is evident from the strong and comprehensive language of Section 112 * * *. [Emphasis supplied].

We would like to respond to appellants' statement that scientists working in the atomic energy field are "embarking on a new era," and that it is "highly important that ideas in this field be published in order to proliferate ideas from other inventors." But we are powerless to do so absent compliance with the legal requirements governing patentable inventions. Granting appellants a patent monopoly on the present subject matter would, in our opinion, serve to preclude others from carrying out the very experiments necessary to remove the uncertainties and speculations present in their disclosure.

Finding no reversible error, the decision is affirmed.

Affirmed.

SMITH, Judge (dissenting in part, with whom RICH, J., joins).

I think the rejection of claims 1–3 of each of the two appealed applications as unpatentable over the prior art was proper, and I agree with the majority that that aspect of the board's decisions should be affirmed.

However, the rejection of all claims in each application as based on an inadequate disclosure is indefensible. See my opinions in appeal No. 7284; 347 F.2d 557 and appeal No. 7295, 347 F.2d 563 both decided concurrently herewith. Accordingly, I would reverse the rejection of claim 4 in 7365 and claim 6 in 7366.