**Gordon GOULD, Appellant,**

v.

**Robert W. HELLWARTH, Appellee.**

**Patent Appeal No. 8791.**

United States Court of Customs
and Patent Appeals.

Feb. 15, 1973.

Robert R. Keegan, Darby & Darby, New York City, Frances D. Thomas, Jr., Washington, D. C., attorneys of record, for appellant.

W. H. MacAllister, Paul M. Coble, Los Angeles, Cal., for appellee.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

LANE, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding Hellwarth, the junior party, priority of invention as to two counts to a so-called "Q-switched" or "Giant Pulse" laser. Hellwarth is involved on his application serial No. 128,458 filed August 1, 1961.[1] The appellant, Gould, is involved on his application serial No. 804,540 filed April 6, 1959.[2] The determinative issue is whether the disclosure of the Gould application was adequate to enable a person skilled in the art to make an operable device (35 U.S.C. § 112). We agree with the board that it was not and affirm its decision.

1. The Hellwarth application is assigned to Hughes Aircraft Company.

2. The Gould application was assigned to Control Data Corporation during much of the period involved here, but counsel for Gould stated at oral hearing that Gould himself now owns the application.

## The Subject Matter

The laser is a device which provides light amplification by stimulated emission of radiation. Amplification of electronic radiation by stimulated emission of radiation was first attained by devices operating in the microwave frequency range and known by the acronym "maser." [3] The laser, also known as an "optical maser," resulted subsequently when such amplification was achieved at light or optical frequencies. The basic requirement of a maser or laser is a working medium, usually a gas or a solid, containing atoms or molecules having one or more sets of energy levels. Unlike the condition at equilibrium, where lower energy states of a material are more heavily populated than the higher energy states, material constituting a laser working medium must have a higher energy level populated by a significantly greater number of atoms or molecules than a lower level. A medium in such non-equilibrium condition is said to have an "inverted population" or "negative temperature." The medium may be excited or "pumped" to provide the inverted population by means of a source of electromagnetic energy, such as a strong light of suitable wavelength. Laser activity results from the medium in a state of population inversion emitting wave energy of a frequency corresponding to the separation of the inverted pair of energy levels.

The two counts define an "optical maser" comprising basic laser elements —a laser material, means for pumping the material to a condition of stimulated emission, and reflecting means defining a radiation path in the material for repeatedly reflecting the stimulated emission energy radiated by the material between the reflecting means. Additionally, they call for the combination with those elements of means intermediate the reflecting means in the path of the radiated energy for altering the amount of stimulated energy reflected by the reflecting means. The altering means permits impeding the reflections to prevent emissions from the laser for certain periods to allow build-up of the amount of population inversion so that "giant pulses" of greatly enhanced energy concentration are emitted when the impediment is removed. The name "Q-switched" is applied to the modified laser because the altering means controls or varies the electrical quality or "Q" of the "cavity" in which the working material is confined.

Count 3 is representative of the involved counts and reads as follows:

3. Apparatus for controlling the stimulated emission energy output of an optical maser comprising an optical maser material, means for pumping said material to a condition of stimulated emission, means for abstracting energy from said maser, reflecting means defining a radiation path including said maser material for repeatedly reflecting the stimulated emission energy radiated by said material between said reflecting means, [and] means in the path of said radiated energy for altering the amount of stimulated energy reflected between said reflecting means.

## The Proceedings Below

Hellwarth asserted no date of invention prior to Gould's filing date. No priority evidence was submitted by either party and both parties rely on their filing dates. On motion by Hellwarth, final hearing was set to consider the sufficiency of the Gould application, and Hellwarth was granted permission to take testimony of Dr. Bela Lengyel on that question. Appellant took testimony of Dr. Arnold Bloom, Dr. Grant Fowles and Paul Rabinowitz in rebuttal. Lengyel had worked at Hughes Aircraft when the first operable laser was built there by Dr. Theodore H. Maiman in

3. The record shows that the first operating maser was constructed by Dr. C. H. Townes and two associates in 1954. Dr.

Townes shared the 1964 Nobel Prize in physics for his contributions in the maser field.

1960.[4] Lengyel was chairman of a college physics department at the time of testifying and had done extensive writing in the laser field. Bloom and Grant did extensive work in the laser field beginning in 1961 and 1962, respectively. Rabinowitz was employed by TRG, Inc.[5] on laser projects which began in 1959. As the board recognized, all four witnesses were highly qualified in the laser field at the time they testified.

Under Rule 282 of the Patent Office, providing for introduction of printed publications, Hellwarth placed in evidence a number of papers which scientists working in the laser field published beginning in about 1958[6] and work reports on the aforesaid TRG projects.

The Gould application includes a lengthy disclosure directed to obtaining laser action. It also suggests certain uses and refinements for an operable laser, including means for Q-switching such a laser. It is not questioned that the disclosure of the Q-switching feature would be adequate if the application adequately disclosed an operable laser in which the feature could be incorporated. Rather, appellee charged, and the board agreed, that the disclosure was insufficient as of its filing date to enable a person skilled in the art to make an operable laser.

Lengyel's testimony was summarized by the board as follows (with reference to the record omitted):

> The testimony of Lengyel is to the effect that as of 1959 the Gould disclosure did not have sufficient information for one skilled in the art to construct an operative laser of any kind and noted that the Schawlow-Townes paper[7] included most of the

information that was available but an operable laser was not made until 1960 by Maiman. According to Lengyel, in order to construct an operable laser one skilled in quantum electronics would have to know the physical parameters of the material, e. g., its temperature or temperature range; if gas filled, the pressure and approximate size or some relationship between the possible dimensions of the device. The minimum radiation necessary for its excitation if optically excited should be known. If excited by discharge, then the condition of operation of that discharge should be known. The basic properties of the cavity such as reflectivity and curvature of the mirrors should be known. The relation between the various parameters would have to be known quite precisely in order to obtain an operable laser.

Lengyel in his testimony reviewed the Gould disclosure and pointed out that although details are disclosed with respect to various lasers, the application does not disclose a complete set of operating parameters for any laser.

The board reviewed the testimony of appellant's witnesses at length, noting particularly that Bloom and Fowles expressed the opinion that the Gould application gave sufficient information as of 1959 to build a laser. However, it stated:

> The testimony of all the witnesses is fairly consistent in recognizing that the Gould application does disclose various working mediums, dimensions and theories but there is no information which is complete enough for one

---

4. Appellee also took testimony of Dr. Maiman but the board refused to consider that testimony on the ground that appellee did not make timely request for permission to take it. While appellant has somewhat equivocally consented to our considering the Maiman testimony, we have reached our decision without regard to it. If it had been considered, it would have provided substantial further support for affirming the board.

5. A corporation which engaged in scientific research work including work under contract with agencies of the United States Government. TRG later became a division of Control Data Corporation.

6. The publications hereinafter referred to are among those papers.

7. See note 9 infra.

skilled in the art to build an operative laser particularly at a time when one "skilled in the art of lasers" was virtually non-existent.

The board also stated:

The testimony of the witnesses has been helpful to the extent of indicating what knowledge is necessary to construct an operative laser. However, this knowledge, as evidenced by documents entered in evidence and submitted under Rule 282, is the summation of the work of many men spending considerable time experimenting. For the witnesses or any other men skilled in the art to state with certainty what they would have done with the Gould disclosure, coupled with whatever prior knowledge was available in 1959, even with an intense desire for success, is pure speculation.

In reaching the ultimate conclusion that "Gould had inadequate disclosure as of 1959 to build an operative laser," the board stated:

The Gould specification has much disclosure but much work had to be done subsequent to the filing of the application before an operative laser was made. The patent statutes do not contemplate grant of patents for such a disclosure which is merely a fertile field for experimentation. Cf. In re Joliot et al. * * * [47 CCPA 722, 270 F.2d 954, 123 USPQ 344 (1959);] In re Wooddy, Jr. et al. * * * [51 CCPA 1317, 331 F.2d 636, 141 USPQ 518 (1964).]

## OPINION

■ Appellant emphasizes that the counts are not drawn to a laser per se but to a laser modified by means for permitting Q-switched or pulsed operation. He also argues that Hellwarth derived the laser per se on which he imposes Q-switching from the ruby laser

successfully operated by his then co-worker at Hughes Aircraft Company, Maiman, before the Hellwarth application was filed. It is apparent, however, that such circumstances are common, if not usual, with respect to improvement inventions like that involved here, and they have no bearing on the outcome. As in any priority dispute, Gould can prevail only if his application meets the requirements set out in the first paragraph of 35 U.S.C. § 112. The application must include a disclosure of the invention "in such terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."

As recognized by Gould in his application, the problem faced by one seeking to make an operable laser in 1959 was that of successfully applying the principle of amplification by stimulated emission of radiation, which had been successfully applied to microwaves in the maser, to optical or light radiation. Cavities or resonators used to confine the working medium in masers, which characteristically had dimensions in the order of one wavelength, e. g. 1–100 centimeters, could not be used in light amplification because of the comparatively short wavelength of light. As Gould points out in his brief:

Masers operate at microwave frequencies so that their wavelengths differ by a factor of a thousand or more from those of lasers and thus make the maser microwave resonator technology inadaptable to lasers.

While all the difficulties faced in making an operable laser need not be enumerated,[8] it is clear from events that followed that the transition from microwave to light wavelengths proved no easy task.

Dr. Townes, in cooperation with Dr. A. Schawlow of Bell Laboratories, suggested the possibility of making the extension from masers to light wave-

8. A list of "new problems and new aspects of old problems" faced in applying the maser principle to light frequencies is set out in Lengyel, Evolution of Masers and Lasers, 34 Am.J. Physics 903–13 (1966).

lengths in a paper published in 1958.[9] Gould, who had been a graduate student at Columbia University where Townes taught, had begun a literature search in the field.[10] He gained employment with TRG[11] and prepared for it a proposal for research work to build a laser, based largely on the same material as his application. That proposal resulted in a contract with Advanced Research Projects Agency, a Government agency, for research and development work in the amount of nearly one million dollars. The resulting project was assigned a secret security classification. Gould continued to work for TRG but was excluded from the project for inability to obtain security clearance. TRG spent the nearly one million dollar sum in the year following Gould's filing date (May 1959 to May 1960) in attempting to build a laser, but its efforts resulted in failure.

In the meantime, other scientists were also seeking to produce a laser. Maiman achieved the first operable laser in a pink ruby medium in April of 1960. Appellee, a co-worker of Maiman at Hughes Aircraft, disclosed the Q-switched laser in conjunction with such a ruby laser in his application here. After Maiman's success, his ruby laser was promptly duplicated in other laboratories. Soon thereafter laser activity was achieved in other media by other experimenters. As an example, Javan, Bennett and Herriott of Bell Laboratories announced success with a helium-cesium laser at the end of 1960.[12] Gould and others at TRG arrived at an optically pumped helium-cesium laser in 1961 or 1962.[13]

█ This brief history of the attainment of the final operating lasers gives firm support to the board's conclusion that the Gould application was insufficient to teach a person skilled in the art how to make a laser. Whether the "person skilled in the art" is viewed in terms of the laser art, even though an operable laser had not yet been made, or with regard to the art to which the laser "is most nearly connected" (35 USC 112) is not material. The board, as well as the witnesses, considered the case in light of what would be taught to a highly trained person knowledgeable in the fields of microwave masers, spectroscopy, atomic physics and aware of published proposals for making a laser, and we do the same.

The testimony of appellant's witnesses was generally in agreement with Lengyel's view that the application does not disclose a complete set of parameters for a laser as well as his observations as to what knowledge was necessary to produce an operable laser. Opinions of Bloom and Fowles contrary to the board on the ultimate question of whether the Gould disclosure was adequate to enable a person skilled in the art to make an operable laser are incompatible with their testimony as well as that of Lengyel and the other evidence.

In arguing that he does disclose the parameters necessary for a particular laser, appellant states that "[p]erhaps the best example of a complete description of a specific embodiment in the Gould application" is a portion which suggests use of "a gaseous atmosphere comprising a mixture of sodium and

9. Schawlow & Townes, Infrared and Optical Masers, 112 Physical Review 1940–49 (1958).

10. Certain background facts as to Gould's activities are revealed in the court's opinion in Gould v. Schawlow and Townes, 53 CCPA 1403, 363 F.2d 908, 150 USPQ 695 (1966). That case involved a priority contest between a Gould application similar to and filed on the same date as his present application and Schawlow and Townes patent No. 2,929,-

922, issued March 22, 1960, on an application filed July 30, 1958, and assigned to Bell Telephone Laboratories, with the latter prevailing.

11. See note 5 supra.

12. Javan, Bennett & Herriott, 6 Physical Review Letters 106–10 (1960).

13. Rabinowitz, Jacobs & Gould, Continuously Optically Pumped Gas Cs Laser, 1 Applied Optics 513–16 (1962).

mercury" as the working medium. However, both Lengyel, in 1967, and Bloom, in 1968, testified that no sodium-mercury laser had been known to operate. In view of the widespread efforts to obtain laser action in different media which the record shows followed Maiman's initial success in 1960, no basis is seen for accepting this alleged "complete description" as teaching how to make an operable laser.

Appellant also refers to TRG's having constructed an operable helium-cesium laser "after the restrictions on Gould were relaxed enough to permit him to make significant contributions to the development." However, it is plain from the application and the testimony that neither physical dimensions nor particular operating conditions for such a laser are given in the Gould application. Also it was not until between January and April of 1962 that TRG's optically pumped helium-cesium laser was operated. By that time, the state of the art had been advanced by the successful operation of the ruby laser by Maiman and the helium-cesium laser by Javan and his associates. Additionally, a nearly confocal arrangement of mirrors, based on a proposal made by Bell Laboratories in 1961 and not on the Gould disclosure, was used.[14] These circumstances are inconsistent with any claim that the Gould application adequately disclosed how to make an operable helium-cesium laser.

Nor does a claim by appellant that his application "discloses the ruby laser" find any factual support. The application merely lists ruby as a possible alternative medium with the suggestion that it be a single crystal. Information as to the type, size or orientation of the crystal and exactly how it is to be excited is not given. While ruby, in certain forms, was a known maser material, reports of TRG work made of record show that its workers considered it as a laser material in early 1960 but rejected it. Maiman made extensive investigation

before finding that a particular ruby material, a pink ruby, would provide an operative laser under particular conditions.

 Appellant also refers to the action of the examiner in denying appellee's motion to dissolve for insufficiency of the Gould disclosure. What significance that action might ordinarily have is overcome by the fact that the examiner did not have the benefit of all the evidence, including particularly the testimony of the witnesses, which persuades us that the disclosure was not adequate.

 We conclude that the Gould application involved herein does not provide an enabling disclosure of how to make the subject matter of the counts. The decision of the board awarding priority of invention to Hellwarth is accordingly affirmed.

Affirmed.

"most important" in the discovery of new lasers.

14. Bloom described the confocal resonator which came into use in lasers in 1961 as