**COMMONWEALTH ENGINEERING CO. et al., Plaintiffs,**

v.

**David L. LADD, Commissioner of Patents, Defendant.**

**Civ. A. No. 2997–59.**

United States District Court District of Columbia.

Oct. 31, 1961.

Dwight F. Bickel, Dayton, Ohio, and Folsom E. Drummond, Washington, D. C., for plaintiffs.

Jack E. Armore, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is an action against the Commissioner of Patents under 35 U.S.C. § 145, for an adjudication that the plaintiffs are entitled to a patent on an application that the defendant has rejected.

The application was filed by Carl Berger and assigned to the plaintiff Commonwealth Engineering Company of Ohio, on July 27, 1953, and is numbered 370533. It is entitled "Reconstitution of Frozen Biological Cellular Material". It involves a process for rapidly thawing and melting frozen blood. The specific process, in a general way, consists of passing the frozen blood through an elongated tube, which is heated to a high temperature, but the temperature of which gradually decreases to a temperature at the discharge end which it is desired the blood to reach.

The specification does not indicate the purpose or purposes for which this process is to be used. Testimony introduced in behalf of the plaintiff through an expert witness is to the effect that it may be used in connection with the making of medical diagnoses in medical laboratories, as well as in connection with blood transfusions in human beings, and that it may be employed both in connection with human blood and with animal blood, inasmuch as animal blood is used in certain tests in connection with medical science.

The application was rejected on the ground that the alleged invention was lacking in utility. Thus, the Examiner in his answer before the Board of Appeals stated:

"The Examiner is of the opinion that high temperatures denature blood, thus making it unfit for transfusion purposes. In order to rebut the position taken by the Examiner, applicant has presented two affidavits. These affidavits are nothing more than opinion affidavits in that they set forth nothing more than conclusions."

The Examiner concluded:

"In the absence of tests establishing the utility of applicant's process the rejection for lack of utility is considered proper."

The Board of Appeals, in its opinion, pointed out that:

"Appellant has not submitted any factual evidence to establish that frozen blood when rapidly thawed by the claimed process gives a composition useful for transfusion."

It might be added that the plaintiff has not submitted any factual evidence to establish that frozen blood when rapidly thawed by the claimed process gives a composition useful for any purpose whatsoever.

And, again, the Board of Appeals states:

"The Examiner has given sound scientific reasons for rejecting the claims for lack of utility or inoperativeness for the intended purpose. Appellant has not shown wherein the Examiner is in error and has thus far failed to prove his case."

Accordingly, the Board of Appeals affirmed the rejection.

It is, of course well established that two elements must exist in order to justify the issuance of a patent on the product of the inventive faculty: first, novelty; and, second, usefulness. We are dealing here with the element of usefulness, 35 U.S.C. § 101.

It is true, as is argued by counsel for the plaintiff and as was held in a

thorough and well considered opinion by the Court of Customs and Patent Appeals in the Application of Nelson, 280 F.2d 172, 178, that a high degree of usefulness need not be established; all that is needed is some degree of usefulness. In this case, however, the Patent Office held that there was no usefulness whatever in any degree, on the ground that the process will destroy the usefulness and the value of the very product which it is designed to produce by ruining its vital properties. Consequently, on that basis, the process is entirely lacking in utility.

In this connection, it might be useful to advert briefly to the question as to what constitutes utility within the meaning of the patent law. The Circuit Court of Appeals for the Eighth Circuit in Besser v. Merrilat Culvert Core Co., 243 F. 611, 612, held in connection with defining the term "useful" as applied to a machine:

"The term 'useful,' as contained in the patent law, when applied to a machine, means that the machine will accomplish the purpose practically when applied in industry. It is to be given a practical and not a speculative meaning. It means that the machine will work and accomplish the purposes set forth in the specifications."

■ This Court held in Isenstead v. Watson, 157 F.Supp. 7, that the term "utility" is a broad term and implies, among other things, capacity to perform the function or attain the result claimed by the applicant in his disclosure. It further held that, in connection with a composition of matter, the test of utility is whether the invention will attain the purpose and will operate as disclosed and claimed by the inventor. Similarly, in connection with an invention consisting of a process or a method, the term "utility" must necessarily mean whether the process will operate as claimed and will produce the result intended by the inventor.

■■ In this case, the Patent Office held that such a result will not be produced. The plaintiff sought to overcome the opinion of the Patent Office on this technical scientific subject by adducing contrary opinions of other technicians. Ordinarily, in such a situation, the Court should sustain the ruling of the Patent Office since it is presumptively correct. It has been said, time and time again, that great weight must attach to the findings of the Patent Office, especially on highly technical matters. Under the circumstances, in this state of the record, it would seem that some experimentation is necessary to demonstrate the error of the opinion of the Patent Office. One *a priori* opinion as against another *a priori* opinion is not sufficient.

It is argued in behalf of the plaintiff that it should not be necessary to show that the process will operate successfully with human blood as against animal blood. This argument is, however, irrelevant because it has not been shown by experimentation that this invention will accomplish the desired objective even with animal blood.

■■ It may be repeated that it is sought to overcome the impartial opinion of the Patent Office by a partisan opinion of the plaintiff's expert, without demonstrating the error or alleged error of the Patent Office by actual reduction to practice or even by laboratory experiments. To be sure, from a technical legal standpoint the filing of the application constitutes a reduction to practice, but when the Patent Office expresses a technical opinion that a process would not operate as claimed or would not result in the product desired to be obtained by the process, in order to overcome this conclusion some proof must be submitted and not merely another expert's *a priori* opinion, especially a partisan expert. By referring to the expert as partisan the Court does not mean to imply any criticism. The Court was impressed with the experience and the attainments of the plaintiff's expert. His opinion, however, was reached entirely on *a priori* reasoning, and it must be realized that partisanship is part of the unconscious make-up of every human being. Under these circumstances, the Court is of the opinion

that the ruling of the Patent Office has not been sufficiently overcome to justify the Court in reaching the conclusion that the Patent Office erred.

In this connection, it is interesting and significant to refer to some of the proceedings in the Patent Office as contained in the file wrapper. In his first action the Examiner concluded:

"The claims are rejected for lack of utility in the absence of clear convincing scientific proof that the composition produced by applicant's process is safe, effective, reliable for the purpose set forth in the specification."

Obviously, this might well have been construed as an invitation to submit some proof, but it seems to have been ignored by the plaintiff.

In a later action, found on page 48 of the file wrapper, the Examiner again stated:

"The claims are again rejected for lack of utility. There has been no showing made to the effect that the high temperature that applicant uses would not cause denaturization of the blood proteins due to localized heating."

A similar statement was made by the Examiner in a still later action, found on page 64 of the file wrapper.

Then, finally, the plaintiff submitted an affidavit to the Patent Office. That affidavit was made by the Chairman of the Board of the plaintiff corporation. It is very general in its nature and it states what the inventor has found. No affidavit was submitted from the inventor or from anyone else giving any details.

Finally, another affidavit was submitted, sworn to by one Leo J. Novak, Vice-President in charge of research and development for the plaintiff corporation. He stated:

"Frozen blood cells reconstituted in accordance with applicant's invention have been used and found to be satisfactory."

Such a general conclusion is of no value as evidence. If there had been experimentation in the laboratory, those experiments should have been summarized; if there had been use in actual practice, such uses should likewise have been summarized.

The plaintiff strongly relies on the recent decision of the Court of Customs and Patent Appeals in the case of In re Krimmel, 292 F.2d 948. That case is clearly distinguishable, however, because there a certain amount of experimentation had been conducted successfully, and the Court held that this was sufficient to show the utility of the alleged invention there involved.

The foregoing discussion necessarily leads to the conclusion that no error has been shown in the ruling of the Patent Office that the invention is lacking in utility.

The Court might well, however, in addition, refer to its opinion in Isenstead v. Watson, 157 F.Supp. 7, 9, in which it suggested that:

"Great care and scrutiny should be particularly taken in connection with applications for medical patents. While the granting of a patent does not legally constitute a certificate that the medicine to which it relates is a good medicine and will cure the disease or successfully make the test which it was intended to do, nevertheless, the granting of such a patent gives a kind of official imprimatur to the medicine in question on which as a moral matter some members of the public are likely to rely."

These remarks are equally applicable to a process intended for medical use.

Accordingly, judgment will be rendered on the merits in favor of the defendant dismissing the complaint.

The Court is indebted to both counsel for a very able and interesting presentation of this case.

Counsel for the Patent Office will submit proposed findings of fact and conclusions of law and judgment.