Henry K. PUHARICH, Appellant,

v.

Edward J. BRENNER, Appellee.

No. 22286.

United States Court of Appeals
District of Columbia Circuit.

Argued March 21, 1969.

Decided June 25, 1969.

Mr. Fritz Schweitzer, Jr., New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for appellant. Mr. Don-

ald R. Dunner, Washington, D. C., also entered an appearance for appellant.

Mr. Joseph F. Nakamura, Washington, D. C., Attorney, with whom Mr. Joseph Schimmel, Solicitor, was on the brief, for appellee.

Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellant, a disappointed applicant for a patent, brought an action pursuant to 35 U.S.C. § 145, seeking a judgment awarding him a patent. The district court gave judgment to the Commissioner. We affirm.

I

Appellant claims to have invented a device that is effective to expand extra sensory perception and assist in the study of the so-called extra sensory phenomenon. It is a kind of cage, one that apparently looks something like a quiz show think booth, which has electrical installations in the screen casing for generating electrical currents and impulses.

Appellant says the phenomenon of extra sensory perception involves "perceptive abilities of a gifted or 'sensitive' human subject which are greater in certain respects than for other persons, at least at certain times and under certain conditions." An example, he says, is the experience of telepathy—"whereby a communication of some kind may be experienced between parties without conversation or other conventional form of person-to-person communication."[1]

■ Appellant's brief is an interesting presentation of some of the lore and learning of ESP. He claims, in effect, that the trial was unfair because the trial judge was skeptical about the existence of ESP, yet did not permit introduction of proof concerning the existence and validity of ESP. What the trial judge did seems sound to us. He held that neither the theory nor existence of extrasensory perception was on trial as such. While he evidenced a skeptical attitude, his actual rulings assumed, arguendo, that there was an ESP phenomenon, and focused on the question whether appellant's invention, which claimed to enhance ESP sensitivity, was operable.[2] He permitted appellant to introduce evidence as to the working and functioning of his invention. He assumed, by fair implication, that an invention that aided in studying the ESP phenomenon might be worthy of patent. We make the same assumption, without deciding the ques-

---

1. According to appellant's brief this kind of extrasensory experience, telepathy, is not uncommon, but it is rare that an individual will frequently have such experiences. Those individuals who receive telepathetically on a regular basis are "sensitives," people gifted with extrasensory perception. Appellant suggests in brief that "card 'reading'" is an experiment whereby sensitivity can be established and measured. In the experiment the subject is asked to identify the color of a card as each card is removed from a pack face down, or indicated in some other fashion. On a random basis it is possible to compute a subject's mathematical chances of identifying correctly simply on a guess. When a person identifies a significantly higher number and percentage it suggests a special ability. With a sufficient number of cards, the odds that a person will "guess" correctly two-thirds or three-quarters of the time are so mathematically small that a statistical inference exists to justify the conclusion that some factor other than chance is at work.

2. The Board of Patent Appeals may well have erred insofar as it proceeded in part on the premise that the applicant had not submitted convincing evidence that the power of extra-sensory perception exists. Taking the record as a whole, we do not think this affected the result. The Board had independent basis for its conclusion that applicant had not offered convincing evidence that his device was operable. The district court, which explicitly assumed (at least for purposes of decision) that some persons could have ESP, found no convincing evidence that this device was operable to enhance ESP powers. The examiner found that there was no basis for concluding that the results described would be achieved in another experiment.

tion. We see no reason for reversal in terms of the basic approach of the trial judge.

■■ The Patent Office denied appellant's application on the ground that he had not demonstrated that his creation was useful or operative.[3] After hearing appellant's evidence at trial, and upon weighing the Patent Office's conclusion, the trial judge found that appellant had not met his burden of thoroughly convincing the court that the Patent Office had erred, of demonstrating that the apparatus has the effect of enhancing the powers of extrasensory perception in the few individuals having such powers. Stripped of rhetoric appellant's case amounts to an attack on the findings of the district judge. We cannot say that the findings are either clearly erroneous or otherwise subject to reversal.

## II

Appellant's presentation at trial was largely confined to testimony describing an experiment with so-called sensitives, called upon to identify the colors of playing cards. The testimony and certain statistical data recorded in the experiments contain some support for the inference that the subjects were in fact "gifted" in some unusual fashion, and

that their powers of perception increased when they entered appellant's cage.[4]

■ However, we do not think the Patent Office exceeded its authority when it came, in effect, to insist that the applicant support operability by an additional submission, either (a) a duplication of the experiment, or alternatively (b) a convincing theoretical explanation for the claimed effects of invention.

In some cases it may be possible from a scrutiny of the application itself for the Patent Office to discern the contour of the invention. The examiner may be able to see at a glance not only that this is something new, but also that it works and how and why it works. Invention, it has been said, may lie in discovering the obvious. This does not undercut the statutory requirement of obviousness, it rather underlines that what is obvious now, on reading the inventor's submission was not at all obvious then, before he made it known.

In other cases a painstaking examination of the matter may be necessary. There may be need for the applicant to give instruction and education in depth.

■ When the background subject matter is as problemful as extrasensory perception, the Patent Office may have special reason for calling on an applicant

---

3. Appellant concedes that an invention must be useful and operative before a patent may issue. Section 101 of Title 35 provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

"Usefulness" within the context of section 101 means that an invention "would produce the result claimed or be otherwise useful." See Commonwealth Engineering Co. v. Ladd, 113 U.S.App.D.C. 53, 304 F.2d 630 (1962), affirming, 199 F.Supp. 51 (D.C.1961).

4. Appellant's experiments consisted of tests on nine sensitive subjects who were asked to identify the colors of playing cards proffered face down. In some in-

stances the subjects were allowed to pass a hand over the card. The experiment consisted of three run throughs. First, the subjects worked with a series of 520 cards outside the cage. Scores show that these subjects identified correctly a greater per cent of the cards than could be expected as a matter of chance. The second run through was made with the subject in the cage. In this phase the cage was "untreated"; no voltage was applied. During this stage of the experiment subjects' scores showed a marked improvement over the scores obtained outside the cage. The last run through took place in the cage with the voltage applied. Under these conditions further improvement occurred.

Thus the test run on a Mr. Marion: In a series of 520 trials Mr. Marion scored correctly 390 times outside of the cage, 413 times in the untreated cage, and 455 times in the electrically charged cage.

for additional submissions.[5] The field is controversial, and there appears to be some difficulty in distinguishing in the reports and literature between those efforts at extending our frontiers of knowledge that are serious and responsible and those that are scanty and superficial. The Patent Office is not required to accept the *ipse dixit* of the applicant. Nor is it necessarily equipped or obliged to conduct an adjudicatory hearing on past observations, and on all the matters, such as accuracy of observation, scientific rigor and controls, that may be involved.

Since the Commissioner is under an obligation to make the findings and reach the conclusions required by statute before he can issue a patent, it may be appropriate for the Patent Office to call for additional submissions, either explanations, reports of experiments or references.

While appellant's experiments may provide a basis for an inference that his cage might enhance extrasensory powers, their probative value is muted by the fact that subjects performed significantly better simply after being placed in the uncharged cage. It occurs to us to be consistent with the applicant's submission that the psychological stimulus of a different environment, and the experimenter's demonstrated interest in the subject, may have accounted in substantial measure for the improved performance. The Patent Office apparently concluded that the data submitted are too inconclusive to warrant a finding of operability, i. e., a finding that the same results would recur in the future.

The applicant here did not show an acceptance of his hypothesis by a substantial section of the scientific community, nor did he present the kind of evidence, such as duplication of the experiment, that is so persuasive on its own as to make it unreasonable to reject the applicant's claim.[6]

▮ The applicant may be faced with a difficult if not insuperable dilemma. Appellant contends that the nature of his research and experiment was such that it would be onerous to the point of practical impossibility to arrange a duplication, if that is held necessary to prove operability. But the burden of persuasion is on the applicant and we cannot require a patent to issue if as to any requirement the Commissioner has a substantial doubt. California Research Corp. v. Ladd, 123 U.S.App.D.C. 60, 356 F.2d 813 (1966).

▮ On appeal, the applicant's administrative burden is compounded by the settled doctrines that deference is owed to the findings of the Patent Office, and by this court to the findings of the trial judge affirming the Patent Office determination.[7]

▮ There is a presumption favoring a Patent Office determination of operability even assuming, as appellant argues, that the degree of deference due such a determination is not as great as when the issue is obviousness. Here the administrative determination is sup-

5. We take note that J. B. Rhine, former Director of the Parapsychology Laboratory at Duke University, emphasizes the difficulty of testing telepathic ESP "under strict experimental conditions." A Conversation with J. B. Rhine, Psychology Today 20, 21 (March 1969).

6. *Compare* In Re Oberweger, 115 F.2d 826, 28 CCPA 749 (1940); In re Perrigo, 48 F.2d 965, 18 CCPA 1323 (1931) where the court noted: "The question of patentable invention ordinarily must be determined by applied science, as understood by those skilled in the art to which the invention relates, and, if one presents a device which cannot be tested by any known scientific principles, he must, at least, demonstrate its workability and utility and make clear the principles upon which it operates." 48 F.2d at 966.

7. California Research Corp. v. Ladd, 123 U.S.App.D.C. 60, 356 F.2d 813 (1966); Johns-Manville Corp. v. Ladd, 117 U.S.App.D.C. 262, 328 F.2d 563 (1964); Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449 (1940).

ported by these salient considerations: (1) Applicant is seeking a patent on the basis of tests viewed solely by him and his consultants. (2) The testing which took place was limited in extent—necessarily limited, says the applicant, in view of the shortage of "sensitives," but limited none the less. (3) The data show the subjects performed substantially better simply by entering the cage, without the benefit of the electrical charge, which appellant posits as the crucial contribution of his invention—a point beyond applicant's power to explain.

The judgment of the District Court reflects application of principles that are sound and fair, and it must be

Affirmed.