Application of Tore V. SAETHER.

Patent Appeal No. 9085.

United States Court of Customs and Patent Appeals.

Feb. 28, 1974.

**850**

David L. Just, New York City, attorney of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents. Robert D. Edmonds, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

MILLER, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claim 7 in application serial No. 840,890, filed May 26, 1969, for "Elastomeric Platform For Furniture." We reverse.

### FACTS

The invention is an elastomeric platform defined by certain specific physical characteristics rather than ingredients and having a unitary structure which replaces the webbing normally employed to support cushions in furniture such as chairs and couches. The following figure, taken from appellant's specification, illustrates in a top view the platform in position in a wood furniture frame:

**FIG. 1**

The claim on appeal, with added paragraphing and bracketed material supplied, is:

A member adapted for attachment to a furniture frame comprising an elastomeric platform having

a durometer, Shore A, ASTM D–676–59T hardness of about 55 to about 80,

a modulus at 50% elongation, [force required to produce a given elongation] ASTM D–412–62T from about 150 to about 600 p. s. i.,

a tear resistance, ASTM D–624–54 die C of at least about 100 pounds per inch and

a tension set, [deformation remaining on removal of deforming stress] ASTM D–412–62T of not more than about 35% and

a permanent set not over about 15%.

$$\left[ \frac{\text{Distance after Pounding} - \text{Original Distance}}{\text{Original Distance}} \times 100 \right]$$

The last physical characteristic is a result of the combination of the first four physical characteristics.

In response to the first office action, appellant filed an affidavit by Clement A. Damicone, a participant in the research and development project which culminated in the present application. It states that the first four characteristics "are critical and essential for achieving the improved elastomeric platforms described in the application"; that the improvements are "a minimum permanent deflection," "a very long life" of up to fifteen years, and increased adaptability for installation "under varying degrees of tension"; that there is a very specific, but "random," correlation of the claimed physical characteristics which "cannot be defined as an ordered mathematical relationship"; that the claimed ranges must be observed in order to achieve the improvements in elastomeric platforms; and that exemplified elastomeric formulations outside the claimed ranges cannot obtain such improvements. Four elastomeric formulations were presented for comparison, each having approximately the same ingredients but in different proportions. One such formulation met all the physical characteristics of the above claim while the other three lacked one, two, or three of the claimed physical characteristics, depending on the proportion of ingredients. The scope of the claimed ranges was illustrated as follows:

## PRIOR ART

Kudriavetz[1] and Heuston[2] show elastomeric platforms, but neither has any disclosure of desired physical characteristics. Coulter[3] discloses an improved rubber composition containing a rein-

1. United States Patent 3,117,819, issued January 14, 1964, on Serial No. 177,588, filed March 5, 1962, for "Resilient Chair Support."

2. United States Patent 3,179,469, issued April 20, 1965, on application Serial No. 265,932, filed March 18, 1963, for "Elasto-

mer Furniture Support." Both the Kudriavetz and Heuston patents are assigned to the assignee of the presently appealed application.

3. United States Patent 2,945,834, issued July 19, 1960, on Serial No. 637,860, filed February 4, 1957, for "Vulcanizable Rubber

forcing-type furnace black to prevent scorching and to obtain "excellent and uniform physical properties." The physical properties disclosed are longer scorching times (Mooney scorching test), tensile strength, modulus at 300% elongation, elongation at break, hardness (British Standard degrees), and resilience at 50°C. Parks [4] discloses improved rubber compositions evidenced by ultimate tensile strength, ultimate elongation, modulus at 300% elongation, and modulus at 200% elongation. Parks and Coulter contain no disclosure concerning the use of their respective rubber compositions for elastomeric platforms for furniture.

## THE REJECTION

The Board of Appeals sustained the examiner's rejection of the claim under 35 U.S.C. § 103 as unpatentable over Kudriavetz and Heuston in view of Parks and Coulter,[5] saying that the claim does not distinguish from "an old sheet of rubber" by use of the term "platform." Assuming arguendo that "platform" does impart such a distinction, the board agreed with the examiner's holding of obviousness, stating:

> Outside of the wide ranges of hardness and modulus, the claim, in effect, reads upon an elastomer sheet that, ideally, is immune to tearing, tension set, and permanent set, the latter property apparently being the result of the others, rather than an additional one. Certainly these are simply the obviously desirable characteristics to the users of the platforms of Kudriavetz and Houston [sic]. Put another way, such differences present "no real improvement or advance beyond the physical requirements of the users."

Composition And Process For Vulcanizing Same."

4. United States Patent 2,909,584, issued October 20, 1959, on Serial No. 788,483, filed January 23, 1959, for "Vulcanizable Natural Rubber Composition And Method Of Vulcanizing Same."

[Citing Magnavox Company v. Muter Co. (Rola Company, Inc.), 160 F.Supp. 169 (N.D.Ohio 1956).]

## OPINION

■ We disagree with the board's statement, that the term "platform" imparts no distinguishing features or structure. It is axiomatic that not only must claims be given their broadest reasonable interpretation consistent with the specification, but also that all limitations must be considered. Thus, the claim defines "A member . . . comprising an elastomeric platform." Appellant's specification states that this platform "forms a support for cushions, upholstery and the like in articles of furniture." An example is disclosed in the specification as Figure 1 shown above. To give "elastomeric platform" a meaning consistent with appellant's specification, there must at least be some structure to provide "support" in articles of furniture. We note, incidentally, that Kudriavetz refers to a similar member in his drawing as "elastomer supporting member" and Heuston uses the term "elastomer platform" for his drawing.

The solicitor's position is essentially that appellant has done nothing more than optimize a set of obviously desirable characteristics by mere "routine" experimentation. Appellant argues that he has made an inventive selection of four specific physical characteristics to define an improved elastomeric platform. The Damicone affidavit states that "the four specifications recited in the application claims are only a selected group of other specifications which are customarily used in the field of elastomeric compounding and processing." Appellant's brief includes a list of

5. The examiner had relied on an additional reference, but the Board of Appeals deemed it cumulative and ineffective due to its effective date being subsequent to that of appellant's.

these [6] and points out that none of the references discloses the specific physical characteristics claimed.[7]

Appellant further argues that he was the first to recognize that the problem of loss of seating comfort is related to cold flow and sag of the elastomeric platform; that he then devised a testing machine to measure the permanent set and determine that a maximum of 15% was necessary. To achieve the desired permanent set, appellant defines the platform in terms of four specific physical characteristics, rather than chemical ingredients.[8] Thus, appellant says he discovered the source of the problem (cold flow and sag), a means of measuring the source of the problem by permanent set, and a group of specifications (the four physical characteristics) for an elastomeric platform which will possess the desired permanent set.

■■ Although the board described one of appellant's key discoveries, that of permanent set, as merely an "obviously desirable" characteristic, this would not make appellant's invention, considered as a whole, obvious. See Puharich v. Brenner, Com'r. of Pats., 134 U.S. App.D.C. 399, 415 F.2d 979 (1969). Obviousness is not to be determined on the basis of purpose alone. In re Graf, 343 F.2d 774, 52 CCPA 1206 (1965). Nor does it appear obvious that a low permanent set is desirable, considering the

varying degrees of tension in different items of furniture and the objective of optimum seating comfort for a long period of use. Appellant has presented evidence of unobviousness by his specification and the Damicone affidavit showing discovery of the cold flow problem, the existence of permanent set, and the four physical characteristics required to enable an elastomeric platform to possess the desired permanent set. In contrast, the board's statement lacks evidential support in the record.

In further support of his argument that he has made an inventive selection of four specific physical characteristics to define an improved elastomeric platform, appellant points out that his claim includes a *critical range* for each and that there is a *random* correlation between these critical ranges, as distinguished from a mathematically-predictable correlation. In support of his contention of random correlation before the Patent Office, appellant pointed out that the claimed range for hardness is at the upper range (indicating greater hardness), while the tension set is at the very low end of the total range. We also note that the claimed modulus at 50% elongation is at the lower end of the total range. In the absence of rebuttal by the Patent Office, it appears that if it were obvious to optimize any of the specified physical characteristics,

**6.** Listed were: Tensile strength, elongation %, tensile modulus, compressive strength, flexural yield strength, Rockwell hardness, Shore hardness, Moh's hardness, Knoop hardness, flexural modulus, compressive modulus, shear strength, deformation under load, tensile impact strength, Izod impact strength, stiffness, stress crack resistance, modulus of elasticity, shear modulus, modulus of elongation, tear resistance, tension set, modulus of elasticity (in tension), modulus of elasticity (in flexure), modulus of elasticity (in shear), and bearing strength. Selection of four from this list, along with the desired ranges for each, is in sharp contrast to optimization of the three principal known ingredients in In re Reese, 290 F.2d 839, 48 CCPA 1015 (1961).

**7.** Although Coulter discloses a hardness measured in British Standard degrees, no argu-

ment has been presented by the Patent Office that such degrees bear any relationship to the claimed Shore A units. In response to a question at oral hearing, appellant's counsel admitted that it might be possible to correlate a modulus at 50% with a modulus at 25%, but the Patent Office has made no argument concerning any correlation or comparability between the claimed modulus at 50% elongation and the modulus at 300% and at 200% disclosed by Parks and the modulus at 300% disclosed by Coulter.

**8.** The solicitor's brief refers to appellant's claim as "a claim to an unspecified elastomer composition," but we note that there has been no rejection under 35 U.S.C. § 112. Also appellant's specification contains an example of ingredients and their proportions used in making an elastomeric platform possessing the claimed physical characteristics.

this would not lead one skilled in the art to the claimed ranges for the others.

Concerning the claimed ranges of hardness and modulus, the board states that they are "wide," while appellant argues they are both "critical" and "narrow." Appellant states that various methods of measuring hardness over a variety of ranges are known, each having different scales. The claimed range covers 25% of *one* scale of the Shore hardness method. The claimed values of modulus at *50% elongation* cover approximately 15% of the range shown in the above illustration, with moduli at other percentages of elongation further narrowing the breadth of the claim. The tear resistance, while seemingly encompassing a large portion of the range, is measured by die C, there being a number of different dies in the testing procedures set forth in the claim. And appellant notes that the tension set range of less than 35% is even narrower than that shown in the above illustration since tension sets above 100% may exist.

While there may be some differences of opinion over the breadth of the claimed ranges, the important point is that a random correlation of the claimed ranges exists in an elastomeric platform having a permanent set of not over 15% and having the improvements described in the Damicone affidavit, discussed above.

Evidence of the random correlation is also provided by the Damicone affidavit, which shows that, as a result of varying the proportions of the same ingredients, elastomeric platforms possessing different values for the selected physical characteristics were, as would be expected, produced. With these different proportions, the affiant obtained one elastomeric platform possessing values within all the claimed ranges; another, which failed to meet the required hardness, modulus at elongation and tear resistance; another, which failed to meet the required hardness and modulus at elongation; and, finally, another which failed to meet the required modulus at

elongation. This is persuasive evidence that a random correlation of all the claimed ranges exists in an elastomeric platform possessing an unobvious set of physical characteristics, which are the limitations of the claim, and this random correlation is a further indication of unobviousness.

■ In his argument that "mere routine experimentation" was involved in determining the optimized set of characteristics, the solicitor overlooks the last sentence of 35 U.S.C. § 103, which states that "[p]atentability shall not be negatived by the manner in which the invention was made." In re Fay, 347 F.2d 597, 52 CCPA 1483 (1965). Here we are concerned with the question of whether the claimed invention would have been obvious at the time it was made to a person having ordinary skill in the art—not how it was achieved.

In addition to the differences from the prior art, which is shown by the references and by appellant's specification, further evidence of unobviousness is shown by the improvements and unexpected results obtained by the claimed invention: first, no special attachments are needed for the claimed elastomeric platforms; second, optimum seating comfort is maintained over an increased life of up to fifteen years; third, a minimum permanent set has been achieved; and fourth, inventory requirements are reduced, because only one type of elastomeric platform is needed for installation under varying degrees of tension.

The board's position is that the differences between appellant's platform and those of the primary references represent merely "the physical requirements of the users." However, it is noted that during oral argument appellant's counsel stated that fiberglass chairs would have a Shore A durometer of approximately 100. Since this would presumably be appropriate to the physical requirements of the users, but is clearly outside the range claimed by appellant, we believe some evidence in support of the board's position should appear in the

record. In re Freed, 425 F.2d 785, 57 CCPA 1089 (1970).

In support of its characterization of the differences between appellant's invention and the prior art as "no real improvement or advance beyond the physical requirements of the users," the board cites Magnavox Company v. Muter Co. (Rola Company, Inc.), 160 F.Supp. 169 (N.D.Ohio 1956), affirmed on appeal, 253 F.2d 576 (6 Cir. 1958). The claim at issue there involved a loud speaker comprising a small unit for compact spaces such as those in automobiles. In holding the patent invalid, the court said:

> The problem then was, as I earlier characterized it, to accomplish a reduction in size of the structure and component parts to suit the requirements of the users without impairing its efficiency or a successful production of the desired tone quality and volume. This, the defendant claims, Smith accomplished in a new and original way; but differences in measurements, or thickness of materials, or design of structures such as here considered do not rise to invention, nor, likewise, do size and cost. To the lay eye and understanding there was no real improvement or advance beyond physical requirements of the users and this did not constitute invention.

To extend this statement, as the board would, beyond the narrow limits of the case to which it was meant to apply, would logically preclude virtually all patents, since "the aim of most inventions is to satisfy the requirement of the users." This we are not about to do.

██ To summarize, we conclude that the board erred in affirming the examiner's rejection and holding appellant's invention to be obvious for the following reasons: the term "elastomeric platform" denotes a structure to provide support in articles of furniture; the claimed combination of physical characteristics is not suggested by the references, alone or combined; no showing has been made that one skilled in the art would select the four specifically claimed physical characteristics, much less the ranges specified for them; the claimed ranges are critical and produce unexpected results in an improved elastomeric platform; and the relationship of the claimed physical characteristics is one of random rather than mathematical correlation.

The decision of the board is *reversed*.

Reversed.

RICH, Judge (dissenting):

I respectfully dissent, believing that the rejection under § 103 was well-founded.

Appellant, in his own specification and in the Damicone affidavit, by one who worked on the invention, makes it plain that, the desired properties of the furniture platform being known, "Anyone skilled in the elastomeric compounding and processing field would know" how to compound rubber to get the properties. Rubber compounded to meet the requirements appears to have been already known.* So were rubber chair bottoms. The search for the best one was routineering, the desiderata were obvious, and the way was known. The claimed subject matter was obvious to those skilled in the rubber compounding art.

Appellant did not discover permanent set or cold flow, i. e., sag after use. Anyone who has seen an old rubber band knows that it is desirable to keep that property to a minimum for as long as possible. There is no magic in the 15% limitation; it is merely the *maximum* to be tolerated. Appellant prefers 5% and, if attainable, would no doubt prefer none. I think it is very obvious that low permanent set is desirable. Nobody knows that the life of the furniture plat-

---

* Appellant's specification, after stating his four essential "physical property" ranges, states: "The compounding of rubber and other elastomers to the above specifications is well known in the art," as the board noted in finding the rubber sheet to be "old."

form has been extended up to 15 years; that is a mere expectation which appellant forcasts on the basis of accelerated tests conducted during a short period.

